UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
THOMAS R. HINRICHS,

                         Plaintiff,            **MEMORANDUM AND ORDER**
        -against-                    **CV 23-1771 (AYS)**

BROOKHAVEN TERMINAL OPERATIONS,
LLC., BROOKHAVEN RAIL LLC,
BROOKHAVEN RAIL FREIGHT SERVICES LLC,
and SILLS ROAD REALTY LLC,

                         Defendants.
-------------------------------------------------------------X

**APPEARANCES:**

LAW OFFICES OF PHILIP P. VOGT, PLLC
Attorneys for Plaintiff
BY:    PHILIP PATRICK VOGT, ESQ.
        ELIZABETH CHIATTO, ESQ.
5 Penn Plaza, 23rd Floor
New York, New York 10001

MORRIS DUFFY ALONSO & FALEY
Attorneys for Defendant Brookhaven Terminal Operations, LLC
BY:    DANIELLE J. REISS, ESQ.
        LYNN GOLDER, ESQ.
        KENNETH PITCOFF, ESQ.
        MICHAEL ADAM CZOLACZ, ESQ.
101 Greenwich Street, Ste. 22nd Floor
New York, New York 10006

GORDON REES SCULLY MAUNSHKANUI, LLP
Attorneys for Defendant Brookhaven Rail, LLC
BY:    LEE HENIG-ELONA, ESQ.
One Battery Park Plaza, 28th Floor
New York, New York 10004
290 W. Mt. Pleasant Avenue, Ste. 3310
Livingston, New Jersey 07039

RUSKIN MOSCOU FALTISCHEK, PC
Attorneys for Defendants Brookhaven Rail Freight Services LLC and
Sills Road Realty LLC
BY:    JONATHAN C. SULLIVAN, ESQ.
        ROSS J. KARTEZ, ESQ.

1425 RXR Plaza, East Tower 15th Floor
Uniondale, New York 11556

**SHIELDS, Magistrate Judge:**

Plaintiff Thomas R. Hinrichs ("Plaintiff" or "Hinrichs"), a former employee of Defendant

Brookhaven Terminal Operations, LLC ("BTO") commenced this action seeking damages for

injuries allegedly suffered during the course of his employment. See generally Plaintiff's

Complaint (the "Complaint") appearing as Docket Entry herein ("DE") 1. Plaintiff alleges that he

was injured while working for BTO at the Brookhaven Rail Terminal, located in Yaphank, New

York (the "Terminal"). In addition to naming BTO as a Defendant, Plaintiff also names: (1)

Brookhaven Rail, LLC ("Brookhaven Rail" or "Rail"); (2) Brookhaven Rail Freight Services,

LLC ("Freight") and Sills Road Realty, LLC ("Sills Road").

BTO is the only Defendant sued pursuant to the Federal Employers Liability Act, 45

U.S.C. §51 (the "FELA").  All other Defendants are alleged to be liable pursuant to State law.

Plaintiff's FELA claim against BTO is thus the sole basis for Federal jurisdiction. The parties

take opposing positions as to whether or not BTO is a proper FELA Defendant. While all agree

that BTO was Plaintiff's employer, they dispute whether BTO is a "common carrier" within the

meaning of FELA. If BTO is not a FELA common carrier, it cannot be liable under that statute; if

it is, FELA and its concomitant liability standards apply. In view of this core legal dispute the

parties were directed to engage in limited and expedited discovery tailored to the question of

whether BTO is a FELA common carrier. That discovery is now complete.

There are presently three dispositive motions before the Court. As forecasted, BTO

moves for summary judgment as to Plaintiff's FELA claim. DE [55]. Rail moves to dismiss or

for summary judgment, DE [54], as have Freight and Sills Road, DE [61]. All Defendants argue

that BTO is not a common carrier and therefore seek dismissal of the FELA claim. Rail seeks

summary judgment on the issue of negligence liability. BTO, Freight and Sills Road reserve their rights to dispute such liability. DE [61-14]. The Court rejects Rail's invitation to rule on liability at this time. Instead, it holds that the only issue ripe for adjudication at this juncture is whether or not BTO is a FELA common carrier. All other claims will rise or fall on the outcome of merits discovery that has yet to take place. Therefore, without further discussion as to Plaintiff's common law claims (and without commenting on Plaintiff's credibility, work history or the way in which he carried out his tasks) the Court denies without prejudice any motion for summary judgment on the issue of liability.

As to the viability of the FELA claim, the Court holds for the reasons set forth below that BTO is a common carrier within the meaning of FELA. Accordingly, to the extent that the motions to dismiss and/or for summary judgment are based on the common carrier argument they are denied. The merits of all of Plaintiff's claims will now proceed to discovery.

BACKGROUND

I.    Basis of Facts Recited Herein

In support of their motions the parties each filed a statement of facts in accordance with Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York. To the extent that the statements are properly supported by citation to evidence which would be admissible pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the factual allegations are taken therefrom. Giannullo v. City of New York, 332 F.3d 139, 139 (2d Cir. 2003). Unless otherwise stated the facts set forth below are not in dispute.

II.   Factual Background

A.    The Plaintiff and the Incident Forming the Basis of the Complaint

Plaintiff was, at all relevant times, an employee of BTO. The incident forming the basis of the Complaint (the "Incident") occurred on December 20, 2021 when Plaintiff was performing work at the Terminal. He was driving a truck owned by BTO when, in a single vehicle accident, the truck hit a raised edge of an iron grate drain cover, resulting in Plaintiff's claimed injuries. See DE [54-1] at ¶ 4.

Defendants dispute Plaintiff's description of his duties, as well as his explanation of the Incident. They also accuse Plaintiff of lying during his deposition. See DE [61-14] at 16-17. The parties have not yet engaged in full discovery with respect to these matters. The Court assumes therefore, for the purposes of these motions, that the Incident took place as Plaintiff describes, and that he was injured as a result thereof. As the discussion below makes clear, the Court need neither credit nor discredit Plaintiff's recitation of his duties, or how the Incident occurred, in reaching its decision herein. Instead the Court must focus on the business conducted at the Terminal.

B.    The Business of Transloading at the Terminal

Transloading is the business of receiving materials from a shipper, typically via rail, and facilitating their transportation to a final destination. The Terminal is a freight transload facility that accepts products shipped by Rail. DE [55-6] at ¶ 2. It is a 28 acre property that consists of a yard, a small office building, a storage building, and a rail track. DE [55-6] at ¶ 4. Incoming freight arrives at the Terminal via an interchange between the New York and Atlantic Railroad (the "NY & Atlantic RR") and Brookhaven Rail. The interchange is located at a mainline switch located on the Terminal's property where it abuts the Long Island Railroad. DE [55-6] at ¶ 5.

The Terminal offers both transloading and warehouse services for a variety of customers. Products handled include lumber, cement, flour and petroleum. Goods arrive at the Terminal

from multiple locations throughout the country. Certain materials are stored in a silo or warehoused prior to further shipping. Transloading work at the Terminal is performed either by BTO or a third-party vendor.  All materials received at the Terminal are ultimately shipped out of the Terminal, mostly by truck, to businesses in Nassau, Suffolk, Brooklyn, Queens and the Bronx.

Business at the Terminal is conducted pursuant to contracts entered into between customers and Freight, as discussed below. While Freight appears to be the contracting entity, BTO states that service contracts are entered into between Terminal customers and either BTO or Freight. DE [55-6] at ¶ 16. In any event, these contracts make clear that Terminal customers are not charged via railroad tariffs, but pursuant to the terms of their contracts. DE [61-9] at ¶ 17. BTO states that it was their customers' responsibility to "arrange for their freight to be shipped to the Terminal by railroad." DE [55-6] at ¶ 17. Relying on the exemplar agreement discussed below, Plaintiff states Freight is the entity that "arranges for rail transportation through Brookhaven Rail and other North American rail carriers" and that Freight (which is wholly owned by BTO) or its designees, acts a shipper's agent in arranging transportation services for its Customers on rail carriers." DE [60] at ¶ 17.

III.   Defendants

A.   Brookhaven Rail

Brookhaven Rail is a "short line" railroad that moves rail cars back and forth between the Long Island Railroad main line (where it is interchanged with the NY & Atlantic RR) and the Terminal. It is the only Defendant that all agree is a FELA common carrier. Despite this status, Rail cannot be liable to Plaintiff under FELA because it was not Plaintiff's employer. Plaintiff does not argue otherwise. Neither BTO nor Freight had any involvement or control over Rail's

operations. DE [60] [1]. Unlike BTO, Freight and Sills Road, Rail has no corporate relationship with any of the other Defendants.

Rail operates on the grounds of the Terminal pursuant to an agreement with Freight. That agreement is the "Amended and Restated Railroad Operating Agreement and Sublicense Agreement dated October 21, 2021" (the "Sublicense Agreement"). The Sublicense Agreement divides responsibilities at the Terminal between Rail and Freight (or its designee) for "rail" and "non-rail" services. Rail is responsible for "rail" services. Freight is responsible for "non-rail services". This division of responsibilities is achieved by allowing Rail to sublicense assets at the Terminal from Freight, including railroad tracks, switches and connecting railroad track. This aspect of the agreement between Rail and Freight allows Rail (according to Defendants) to be the entity that performs "railroad services" at the Terminal, while Freight performs transloading services. See DE [61-9] at ¶¶ 20-21. The Sublicense Agreement states that Rail has the right, inter alia, to operate leased assets at the Terminal as a common carrier. Id. at ¶ 22.

In addition to the licensing of Terminal "rail" assets, the Sublicensing Agreement allows Rail to use those assets to use its diesel engines to move rail cars arriving from the NY & Atlantic RR to their proper Terminal transloading location. This placement of rail cars is referred to as "spotting". The location where cars are spotted depends upon their content. Rail states that it is the sole entity responsible for moving rail cars over the tracks at the Terminal and their interchange on the national rail system. It further states that its responsibility for moving rail cars ends when they are uncoupled and unloaded at the Terminal, and resumes when empty cars are

---

[1]     Rail also states that it did not "did not own, maintain, or control the Terminal yard" and had no knowledge of the raised iron grate that is alleged to have caused Plaintiff's accident. These are matters that go to the issue of negligence, if any, of Rail. They are not relevant to the present motion.

re-coupled to Rail's engines. While BTO was Plaintiff's employer for work performed at the Terminal, it did not employ the rail crew that collected cars deposited at the Terminal by NY & Atlantic RR and positioned them for transloading. DE [55-6] at ¶ 15; DE [60] at ¶ 15. Those individuals were employed by Rail.

With the exception of one customer discussed by the parties, Rail is paid for its services pursuant to rates set forth in its contract with NY & Atlantic RR. Those rates are based on publicly posted tariffs. DE [61-9] at ¶ 25. Unlike all other Defendants, Rail is licensed by the United States Surface Transportation Board (the "STB") as a common carrier that is regulated by the Federal Railroad Administration (the "FRA"). Rail employees receive disability and retirement benefits under the Railroad Retirement Act (the "RRA").

B.    Sills Road

Sills Road is corporately related to both BTO and Freight. Specifically, Sills Road is the corporate parent and owner of BTO which, in turn, is the parent company of Freight. DE [61-9] at ¶ 2. Sills Road owned the real property and improvements at the Terminal. It did not own engines or transport people. Plaintiff did not work for Sills Road. All agree that at the time of Plaintiff's employment by BTO, Sills Road was not a common carrier.

Presumably to shed light on the common carrier issue, Sills Road states that it once sought permission from the STB to operate as a common carrier by railroad at the Terminal, through one or more of its subsidiaries. Its STB application was opposed by Rail on the ground that Sills Road was improperly trying to displace Rail as the operator of its railway line. DE [61-9] at ¶ 31. Sills Road's STB application was denied under the procedure that it sought to utilize because, according to the denial, its application was not "routine, uncomplicated and non-

controversial". DE [61-9] at ¶ 32. While Sills Road could have renewed its application under a different procedure, it chose not to do so. DE [61-9] at ¶ 32.

      C.    <u>BTO</u>

As noted, BTO's corporate parent is Sills Road. BTO is the corporate parent and owner of Freight. BTO was responsible for the premises and operations at the Terminal, including transloading and warehousing. It did not own or operate any locomotives or engines or transport people. Nor did BTO employ locomotive engineers, conductors, signalmen or track workers. DE [60] at ¶¶ 12-13. As noted, the crew that collects rail cars for spotting, transloading, subsequent collection and re-coupling are employed by Rail. BTO has no involvement or control over Rail's operations. DE [60].

At all times relevant hereto, BTO was managed by Tom Miller ("Miller"), who was the Terminal manager. DE [55-6] at ¶ 6. Miller submitted a declaration in support of BTO's motion, wherein he describes the business of BTO. Also before the Court is the Declaration and deposition of Andrew Kaufman who was, at all relevant times, Sills Road's president. Both Miller and Kaufman state that BTO, through Freight, billed its customers directly pursuant to written agreements. Unlike Rail, neither BTO nor Freight billed their customers via tariffs. As manager, Miller supervised approximately seven employees (including Plaintiff) who were tasked, <u>inter alia</u>, with performing as-needed labor around the Terminal grounds, transloading cement by connecting a hose from the tanker truck to the tanker railcar, and weighing incoming and outgoing trucks. DE [55-6] at ¶ 8-9; <u>see</u> DE [55-6] at ¶ 10.

BTO states that its employees do not pay into or receive benefits under the RRA. Plaintiff disagrees with this statement. He refers to a 2016 decision of the Railroad Retirement Board (the "RRB"), the governing body of the RRA. That decision, made years before Plaintiff was

employed by BTO, held that it was an employer under the RRA. Defendants challenge the relevance of the 2016 decision, stating that it relied on a then-existing corporate structure at the Terminal, when an entity known as Oakland Transportation Holdings LLC ("Oakland") had an ownership interest in both Rail and Sills Road. That structure placed BTO under common ownership with Rail. Oakland has since sold its interest in BTO to Sills Road. A stated goal of this transfer, according to Defendants, was to allow for the separation of rail and non-rail services at the Terminal, as described above in the Court's description of Rail.

      D.     <u>Freight</u>

Freight is a wholly owned subsidiary of BTO. There is no dispute that Freight did not own engines or transport people. There is also no dispute that Plaintiff was employed by BTO, and not by Freight. Freight takes the position that it had no involvement over the operation of the Terminal. It characterizes itself, instead, as the corporate entity that entered into contracts with customers who utilized the transloading services performed by BTO at the Terminal. Freight has produced an exemplar of a contract that Freight would enter into with customers seeking to use services performed by BTO at the Terminal. That document is properly before the Court as annexed to the Declaration of Plaintiff's counsel submitted in opposition to Defendants' motions. <u>See</u> Exhibit 4 to Declaration of Philip P. Vogt ("Vogt Decl."); DE [54-9] at ¶ ¶ 22-26 (the "Exemplar Contract").

The Exemplar Contract describes Freight as an "operator of a rail freight terminal and transloading facility commonly known as [the Terminal]." It states that Freight "holds itself out to the public as offering to provide transportation and other specified services with regard to certain bulk materials and other products . . . ." <u>Id.</u> The Exemplar Agreement goes on to state that it "applies to all shipments tendered for intermodal or highway transport transportation by

[Freight]." The term "intermodal" is defined to include transportation using both rail and highway transportation through rail and motor transportation providers, or any entity that Freight engages to provide or arrange for transportation. Id.  Freight states that it "arranges for rail transportation through [Rail] and other North American rail carriers" and that it, or its designee, "acts as shipper's agent in arranging transportation services for [customers] on rail carriers." Id.

Plaintiff does not contradict Freight's statement regarding corporate form and ownership. However, relying on the assertion that Freight has no employees or payroll, Plaintiff denies Freight's statements regarding its functions, and concludes that all work at the Terminal was performed by either BTO or other contractors. DE [60] at ¶ 11 (responding to BTO Rule 56.1 Statement). DE [60] at ¶ 6 (responding to Freight and Sills Rule 56.1 Statement). Despite the fact that it employed no one, Freight, the wholly owned subsidiary of BTO, states that it (and not BTO) was the entity responsible for non-rail services such as unloading freight cars, transloading, stevedoring and warehousing of goods.

DISCUSSION

I.    Legal Principles: Standards on Summary Judgment

"Summary judgment is proper 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" ING Bank N.V. v. M/V TEMARA, IMO No. 9333929, 892 F.3d 511, 518 (2d Cir. 2018) (quoting Fed. R. Civ. P. 56(a)). In ruling on a summary judgment motion, the district court must first "determine whether there is a genuine dispute as to a material fact, raising an issue for trial." McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007); see also Ricci v. DeStefano, 557 U.S. 557, 129 S. Ct. 2658, 2677, 174 L. Ed. 2d 490 (2009). "A fact is material if it might affect the

outcome of the suit under the governing law." Baldwin v. EMI Feist Catalog, Inc., 805 F.3d 18, 25 (2d Cir. 2015).

In reviewing the record to determine whether there is a genuine issue for trial, the court must "construe the evidence in the light most favorable to the non-moving party," Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay, 868 F.3d 104, 109 (2d Cir. 2017), and "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." Davis-Garett v. Urban Outfitters, Inc., 921 F.3d 30, 45 (2d Cir. 2019). "A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Pollard v. New York Methodist Hosp., 861 F.3d 374, 378 (2d Cir. 2017). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Ricci, 557 U.S. at 586.

"Summary judgment is warranted, 'after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "In such a situation, there can be 'no genuine issue as to any material fact, 'since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 322-23. "The moving party is 'entitled to a judgment as a matter of law 'because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Celotex, 477 U.S. at 323, 106 S. Ct. 2548. With these standards in mind, the Court turns to discuss the legal principles to be applied and the merits of the motion.

II.    Standards Under FELA

A.    FELA

FELA is "a broad remedial statute" which exists "to provide a federal remedy for railroad workers who suffer personal injuries as a result of the negligence of their employer". Atchison, Topeka & Santa Fe Ry. Co. v. Buell, 480 U.S. 557, 561–62 (1987) (internal quotation marks omitted). It is to be broadly construed to achieve its objective. While a FELA plaintiff must prove the traditional common law elements of negligence of duty, breach, foreseeability, and causation, their burden in showing causation and negligence is lighter than it would be at common law. Tufariello v. Long Island R. Co., 458 F.3d 80, 87 (2d Cir. 2006). The issue of whether a FELA defendant used reasonable care is normally a question for the jury. Moreover, "the right of the jury to pass on this issue must be liberally construed." Sinclair v. Long Island R.R., 985 F.2d 74, 77 (2d Cir. 1993). Accordingly, under FELA, a "case must not be dismissed at the summary judgment phase unless there is absolutely no reasonable basis for a jury to find for the plaintiff." Gadsden v. Port Auth. Trans-Hudson Corp., 140 F.3d 207, 209 (2d Cir. 1998).

B.    Common Carrier

FELA applies only to employees who work for a "common carrier by railroad" engaged in interstate or foreign commerce. Greene v. Long Island R. Co., 280 F.3d 224, 229 (2d Cir. 2002), cert. denied, 538 U.S. 1031 (2003); see 45 U.S.C. § 51. When addressing the common carrier issue courts frequently begin their analyses by citing to Wells Fargo Co. v. Taylor, 254 U.S. 175, 188 (1920), as well as the somewhat more recent case of Edwards v. Pacific Fruit Express Co., 390 U.S. 538 (1968). See, e.g., Sampson v. GATX Corp., 547 F. App'x 369, 375 (5th Cir. 2013); Smith v. Rail Link, Inc., 697 F.3d 1304, 1308 (10th Cir. 2012); Lone Star Steel Co. v. McGee, 380 F.2d 640 (5th Cir, 1967); Greene, 280 F.3d at 230; Gomez v. H&M Int'l Transp., Inc., 2021 WL 236596, * 6 (D.N.J. Jan. 25, 2021). Courts have also considered the

common carrier definition in statues other than FELA, such as the Safety Appliance Act ("SAA") or the Interstate Commerce Act (the "ICA"). See Lone Star, 380 F.2d at 648 (considering common carrier status under FELA and the SAA); Southern Pac. Term. Co. v. ICC, 219 U.S. 498, 523 (1911) (considering common carrier status under FELA and the ICA). Also relevant are certain Circuit-specific tests for determining whether a defendant is a FELA common carrier. E.g., Kieronski v. Wyandotte Term. R. Co., 806 F.2d. 107 (6th Cir. 1986); Lone Star, 380 F.2d at 647. Overlaying all of these tests, factors and considerations is the broad remedial intent to be furthered when interpreting FELA.

In Wells Fargo, the Supreme Court defined the term "common carrier" to mean "one who operates a railroad as a means of carrying for the public—that is to say, a railroad company acting as a common carrier." Wells Fargo, 254 U.S. at 188. In Wells Fargo, the Supreme Court held that the defendant express shipping company which purchased carriage on an unaffiliated railroad was not itself a "common carrier by railroad" within the meaning of FELA. This was because Wells Fargo was not the operator of the railroad "in accord with the ordinary acceptation of the words," which would be "enforced by the mention of cars, engines, track, roadbed, and other property pertaining to a going railroad...." Id. at 187–88.

In Edwards v. Pacific Fruit Express Co., 390 U.S. 538,  the Court held that the owner of a company that leased its refrigerator cars to railroads for transport of perishable products was not a common carrier within the meaning of FELA. The company there was characterized as among those engaged in "a number of activities and facilities which, while used in conjunction with railroads and closely related to railroading, are yet not railroading itself." Id. at 540. Accordingly, the refrigerator car leasing company in Pacific Fruit was not a FELA common carrier.

Relying mostly on Pacific Fruit, the Tenth Circuit held that a joint venture between a company involved in grain storage and a lessor of a commercial warehouse was not a common carrier. See Sullivan v. Scouler Grain Co. of Utah, 930 F.2d 798, 800-01 (10th Cir. 1991). The venture in Scouter received and stored grain that was shipped via railroad. Although the entity owned or leased miles of track, hundreds of railroad cars and several switch engines, those acts were not dispositive to the question or whether it was a "going railroad" and it was nonetheless held not to be a common carrier. Id.  See also Smith v. Rail Link, Inc., 697 F.3d 1304, 1308 (10th Cir. 2012) (common carrier question focuses on what the defendant does, and "asks more simply whether the defendant sought to be held liable under FELA operates a railroad that carries for the public"). Scouter makes clear that the mere presence of the tools of the railroad trade, i.e., tracks, switches and engines, is not dispositive to the common carrier question.

The Fifth Circuit has developed a four factor test for determining whether an entity is a FELA common carrier. Lone Star, 380 F.2d at 647. Those four factors are:

- Whether the defendant actually performs rail service;

- Whether the service being performed is part of the total rail service contracted for by a member of the public;

- Whether the entity is performing as part of a system of interstate rail transportation by virtue of common ownership between itself and a railroad or by a contractual relationship with a railroad, and hence such entity is deemed to be holding itself out to the public, and

- The manner in which the entity is paid for the services it performs, i.e., whether such renumeration is a fixed charge from a railroad or by a percent of its profits.

Lone Star, 380 F.2d at 647.  See e.g., Sampson, 547 F. App'x at 375-76 (applying Lone Star factors and holding that company engaged in business of maintaining, repairing and leasing rail cars was not a common carrier). Lone Star has been characterized as setting forth a set of "considerations", rather than a strict common carrier test. See Scouter, 930 F.2d at 801.

In Kieronski v. Wyandotte Term. R. Co., 806 F.2d. 107 (6th Cir. 1986), the Sixth Circuit synthesized prior cases and found it helpful to focus on three categories of businesses to decide the common carrier question. The two categories of businesses that were observed to fall outside of the definition of common carriers were: (1) in-plant facilities and (2) private carriers. Kieronski, 806 F.2d at 109. Businesses included in the former category included one in which the defendant used its own tracks to transport material and equipment from one place to another. Id.; see, e.g., Wahl v. Watco Cos., Inc., 458 S.W.3d 857 (Mo. Ct. App. 2015); Duffy v. Armco Steel Corp., 225 F. Supp. 737, 737-38 (W.D. Pa. 1964). The second Kieronski category. i.e., private carriers, were also noted to fall outside of the common carrier definition. Such companies are those which haul for others, but only pursuant to individual contracts entered into separately with each customer. Id. The third category identified by the Sixth Circuit, which it noted was "invariably" held to be a common carrier, was described as a "linking" carrier. Kieronski, 806 F. 2d at 109. A businesses falling into this category is held to be a common carrier because it is "the linking entity [that] has become a vital part of the common carrier system and, therefore, becomes a common carrier." Id. Accord Gomez, 2021 WL 236596 (common carrier performs tasks that are inter alia, an "integral part of each railroad line . . . .") (quoting, United States v. Brooklyn Eastern Terminal, 249 U.S. 296, 305-07 (1919).

Closer to home and to the facts herein, is the earlier Supreme Court decision in United States v. Brooklyn E. Dist. Terminal, 249 U.S. 296 (1919). There, the Court considered whether

the defendant Brooklyn Eastern District Terminal (the "Brooklyn Terminal") was a common carrier railroad within the Hours of Service Act (the "HSA"). The HSA, like FELA, applied to employers defined as "common carriers". The Brooklyn Terminal acted as an intermediary spot for goods en route to their ultimate destination, receiving carloads of freight from railroads and transporting that freight to terminal docks for further shipment. See Brooklyn E. Dist. Terminal, 249 U.S. at 284. The critical and simply stated question for the Court as to the common carrier status of the Brooklyn Terminal was "what it does." Brooklyn E. Dist. Terminal, 294 U.S. at 304. And, as the Supreme Court found - what it the Brooklyn Terminal did - was transport goods; its services were public in nature and of the kind ordinarily performed by a common carrier. Brooklyn E. Dist. Terminal, 249 U.S. at 304-05.

Also important to the Court's decision in Brooklyn E. Dist. Terminal was the broad interpretation that Congress intended when enacting the HSA. The HSA was a statute "devised," inter alia, "for the protection of employees." Brooklyn E. Dist. Terminal, 249 U.S. at 286. Relying on this clear intent as well as the type of services performed at the Brooklyn Terminal, the Court held that the defendant was, for purposes of the HSA, a common carrier. Not dispositive to the common carrier question in Brooklyn E. Dist. Terminal were the facts that the terminal did not hold itself out as a "common carrier" or file tariffs with the Interstate Commerce Commission. Brooklyn E. Dist. Terminal, 249 U.S. at 284-85; 303-04. Also not dispositive was the entity's corporate "character or declared purposes." Id. at 304; accord Lone Star, 380 F.2d at 648.

Neither the Lone Star nor the Kieronski factors have been adopted in this Circuit. Lone Star was, however, cited with approval by the Second Circuit in Greene. See Greene, 280 F.3d at 234-36. In Greene, the Second Circuit held that the Metropolitan Transit Authority (the "MTA")

was a FELA common carrier. Id. at 240.  Like other courts, the Second Circuit observed that companies which "merely supply the railroad with equipment such as refrigeration cars are not carriers within the meaning of FELA". Greene, 280 F.3d at 235. Citing to Brooklyn E. Dist. Terminal, the Second Circuit also observed that even companies in "nonrailroad businesses" may be common carriers "when they constitute necessary links to railroads that are common carriers. Id.

Broad congressional intent in enacting FELA also informed the Second Circuit's decision in Greene. As to corporate form, the Greene court stated that "corporate ownership of a subsidiary and overlapping offices and directorates are not, without more, sufficient to impose liability on the parent for conduct of the subsidiary under a statute that does not itself pierce the corporate veil. Still, a parent corporation might be liable for operations of its subsidiary in its own right as operator where the parent 'actively participated in, and exercised control over, the operations of [a] facility'". Greene, 280 F.3d at 234.

With all of these cases in mind the Court turns to their application to the business of BTO.

III.    Disposition of the Motion

At the outset the Court dispenses with any argument relying on the corporate distance between Freight and BTO. BTO is Plaintiff's employer, and Freight's corporate parent. While it was Freight that entered into the Sublicense Agreement with Rail, Freight has no employees. It was therefore BTO, presumably as Freight's "designee" under the Sublicense Agreement, that performed all services at the Terminal. Similarly, while Freight is the entity that entered into contracts with customers that used the Terminal, the activities at the Terminal were conducted by BTO. Ultimately, it is not the corporate relationships that matter to disposition of the pending

motions. The issue presented here is not whether Freight can be held liable as a FELA employer. That is a question for another day. The only issue presently and properly before the Court is whether the transloading operations conducted at the Terminal are those of a FELA common carrier or instead, those that are used only "in conjunction with railroads and closely related to railroading" but not "railroading itself." Pacific Fruit, 390 U.S. at 540. Focusing on what BTO "does", as required in Supreme Court and Second Circuit precedent, this Court holds that BTO is indeed a FELA common carrier.

Most on point to the Court's holding is the Supreme Court's decision in Brooklyn E. Dist. Terminal. There, as here, the entity at issue provided a necessary link in the interstate movement of goods. Thus, the Brooklyn Terminal received carloads of freight from railroads and transported that freight to its docks for further shipment. See Brooklyn E. Dist. Terminal, 249 U.S. at 284. Like BTO, the Brooklyn Terminal acted as an intermediary spot for goods received by rail and on their way to their ultimate destinations. Brooklyn Terminal was a spot between a railroad and docks; BTO is an intermediary stop between a railroad and trucks. Both the Brooklyn Terminal and BTO provide links to transit that are necessary to find common carrier status. See Greene, 280 F.3d at 235 (companies in "nonrailroad businesses" may be common carriers "when they constitute necessary links to railroads that are common carriers).

Also directly on point is a recent FELA case holding that a company providing intermodal services was a FELA common carrier. In Gomez v. H&M Int'l Trasnp., 2021 WL 236596 (D.N.J. 2021), the District Court for the District of New Jersey held that the defendant employer was a FELA common carrier. The employer in Gomez was the Croxton Intermodal Terminal (the "Croxton Terminal"). Like BTO, the Croxton Terminal provided intermodal services to a railway. The services in Gomez involved unloading rail cars and placing them on

18

truck chassis for ultimate ground delivery to their intended destinations. <u>Gomez,</u> 2021 WL 236596 at *6. The business of the intermodal entity in <u>Gomez</u> was "to facilitate the rail services" provided by the railway common carrier to its customers. <u>Id.</u> at *7. Finding that the services provided by the Croxton Terminal were closely analogous to those provided by the Brooklyn Terminal, the <u>Gomez</u> court held the defendant intermodal transporter to be a FELA common carrier. This Court agrees with the holding in <u>Gomez</u> in holding that a transloader such as BTO, which offers its services to the public to provide a link between a railway and further transportation, is a FELA common carrier. This conclusion is supported by <u>Gomez</u> and compelled by <u>Brooklyn E. Dist. Terminal.</u>

Applying the factors developed by other Circuits also supports this Court's holding as to the common carrier status of BTO. As to the <u>Lone Star</u> factors, BTO's transloading service is consistent with the second such factor, which considers whether the Terminal worked as "part of the total rail service contracted by a member of the public." <u>Lone Star</u>, 380 F.2d at 647. While BTO moves goods to their final destination mostly via truck, it provides services to a variety of customers – members of the public - who contract to move their goods to the New York area via rail. Relatedly, the third <u>Lone Star</u> factor also leans in favor of finding common carrier status. That factor asks whether BTO performs services "as part of a system of interstate rail transportation by, <u>inter</u> <u>alia</u>, a contractual relationship with a railroad . . . ." <u>Id.</u> Customers contracting for the use of the Terminal's services have agreed initially to move their goods to New York via rail. They cannot, as a practical matter, move their goods beyond the Terminal without engaging the transloading services provided there by BTO. The Sublicense Agreement with Rail allows it to use the Terminal to further the transportation of goods. That the equipment

used is leased to Rail does not change the characterization of what the Terminal does. <u>See</u> <u>Scouler</u>, 930 F.2d at 800-01

Also supporting this Court's holding is the Sixth Circuit test in <u>Kieronski</u>. BTO's intermediary role in the movement of goods places it squarely within the category of businesses identified by <u>Kieronski</u> which are held to be common carriers. Such businesses, referred to as "linking" carriers are "invariably" conferred with common carrier status. <u>Kieronski</u>, 806 F.2d at 109. Indeed, <u>Brooklyn E. Dist. Terminal</u> was cited by the <u>Kieronski</u> court when describing this category of business.

Arguing against common carrier status Defendants note that BTO is not paid pursuant to a public tariff schedule. But this fact, like the existence of the Sublicense Agreement, does not change the nature of the business conducted at the Terminal. While the method that a customer is charged may weigh in favor of a finding of common carrier status, this factor is in no way dispositive of the common carrier question. Importantly, it does not carry the day when the actual business of BTO is considered. Because that business is a linking rail service, offered to members of the public that find it convenient and profitable to ship their goods to New York via rail and then truck, the method of payment does not defeat a finding that BTO is a common carrier. <u>Accord</u> <u>Gomez</u>, 2021 WL 236596 at *7.

Further, as the Supreme Court has long held, common carriers offer their services to the public at large. And this is how BTO offer its Terminal services. BTO does not work for a single customer or simply store goods. Thus, this is not a case where common carrier status is defeated because the company at issue offers services to a single customer. <u>See</u>, <u>e.g.</u>, <u>Rail Link</u>, 697 F.3d at 1310 (defendant company held not to be a common carrier where it did business with only a single client). Instead, BTO offers its transloading services to a variety of customers. As noted

above, customers contract with railroads to move their goods to the New York area. It is difficult to imagine how shippers would expect their goods to reach customers without the transloading services provided at the Terminal by BTO.

The Court recognizes that BTO does not employ locomotive engineers, conductors, signalmen or track workers. Nor does it transport people. It does, however, employ individuals who work to perform the transloading services offered at the Terminal. Which, it bears repeating, is a facility that provides a publicly available link in the interstate movement of goods. While ownership of locomotives, tracks and switching devices may be relevant to the common carrier question, these factors are not dispositive of the issue. See Scouler, 930 F.2d at 800-01 (holding that entity was not a common carrier despite the facts that it owned and operated tracks, engines and switching equipment); see also Rail Link, 697 F.3d at 1309. Indeed, in Wells Fargo the Court held that the common carrier finding was "enforced by the mention of cars, engines, track, roadbed, and other property pertaining to a going railroad", but this was not dispositive of the question. Wells Fargo, 254 U.S. at 187–88.

The Court affords no weight to Sills Road's argument regarding its failed attempt to operate as a common carrier at the Terminal. A close look at the facts surrounding this attempt reveals that Sills Road's request was denied because the STB did not agree with the procedural path that Sills Road took before that entity. After Sills Road's request was denied, it decided not to pursue the application further. The STB made no merits finding as to the common carrier status of a transloader doing business at the Terminal. The Court is similarly unconvinced that the decision in N.Y. & Atl. Ry. Co. v. Surface Transp. Bd., 635 F3d 66 (2d Cir. 2011) has any application here. That case involved an appeal of a decision of the STB. It was a not a FELA case and applied no standards that are at issue here.

BTO's own description of its business supports the Court's holding that the Terminal is a common carrier facility that provides a link between goods arriving via rail and various destinations in the New York area. See DE [57-5].  the Terminal's webpage, produced during discovery herein (the "Webpage") describes the Terminal as a "multi-modal rail freight facility on Long Island to provide rail-based shipping, warehousing, and logistic services to this critical U.S. market". DE [57-5]. Thus, the Terminal is described as a "vital part" of the common carrier network that begins throughout the country for boarding on the NY & Atlantic RR, through the BTO Terminal, and then on to their final destinations via truck or rail. Indeed, the Webpage touts the Terminal as a "freight facility that provides rail-based shipping, warehousing and Logistics Services via the Terminal's 'connection to the national rail network'" and describes the Terminal as a "conduit to the country's short line and regional railroad network . . . ." DE [57-5]; See generally DE [54-9] at ¶ 28. It matters not, as argued by Defendants, that the Webpage was created when Oakland Transportation (a recognized common carrier) had an ownership interest in BTO and has not been since updated. See DE [61-14] at 19. This fact does not change the nature of the operations at the Terminal. Nor does it change the fact that those operations are conducted by BTO, Plaintiff's employer.

Finally, as noted by virtually every court called upon to interpret the statute, FELA is "a broad remedial statute". It is liberally construed "to provide a federal remedy for railroad workers who suffer personal injuries as a result of the negligence of their employer." Atchison, Topeka & Santa Fe Ry. Co., 480 U.S. at 561–62. This liberal construction is further support for the Court's holding. Were the facts of this case closer, this construction would tip the balance in favor of a finding that the Terminal is a common carrier. Even in the absence of any tie-breaking consideration, the Terminal services compel the conclusion that it is a common carrier.

Accordingly, as an employee of BTO, the Terminal's operator, Plaintiff is entitled to FELA's protection.

CONCLUSION

For the foregoing reasons, this Court denies Defendants' various motions to dismiss and/or for summary judgment appearing as Docket Nos. 54, 55 and 61 herein. The parties are directed to go forward with discovery as to the merits of Plaintiff's claims. Such discovery - fact and expert - is to be complete within the next six months, at which point the parties may engage in additional dispositive motion practice or prepare their joint pretrial order so that this matter may proceed to trial.

Dated: Central Islip, New York
      December 4, 2025

                                        /s/ Anne Y. Shields
                                        Anne Y. Shields
                                        United States Magistrate Judge